UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |
|---|---|
| MELINDA FISHER, SHANNON G. by and through her guardian, BRANDON R. by and through his guardian, MARTY M. by and through his guardian, MISTY M. by and through her guardian, and NEAL SIEGEL, ) ) ) ) ) ) | Case No._____ |
| on behalf of themselves and all others similarly situated, ) ) ) |  |
| Plaintiffs, ) ) | CLASS ACTION COMPLAINT |
| v. ) ) |  |
| KIM REYNOLDS, in her official capacity as Governor of Iowa; CHARLES PALMER, in his official capacity as Director of the Iowa Department of Human Services, ) ) ) ) ) ) |  |
| Defendants. ) |  |

TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT.....................................................................................3

II.     JURSIDICTION AND VENUE...................................................................................4

III.     PARTIES......................................................................................................................5
        A.     Plaintiffs
        B.     Defendants

IV.     CLASS ACTION ALLEGATIONS...............................................................................8

V.     LEGAL BACKGROUND............................................................................................11
        A.     The Americans with Disabilities Act.
        B.     Section 504 of the Rehabilitation Act
        C.     The Federal Medicaid Program
        D.     Home and Community-Based Services in Medicaid
        E.     Medicaid Managed Care
        F.     Due Process

VI.     FACTUAL BACKGROUND........................................................................................18
        A.     Iowa's Medicaid Program
        B.     Iowa's Home and Community-Based Service Waivers
        C.     The Implementation of Medicaid Managed Care in Iowa
        D.     The Crisis for the Plaintiffs
        E.     Defendants' Responsibility for the Crisis

VII.     CLAIMS FOR RELIEF...............................................................................................51
        A.     First Claim for Relief: Procedural Due Process
        B.     Second Claim for Relief: Due Process: Lack of Ascertainable,
            Non-Arbitrary Standards
        C.     Third Claim for Relief: Violations of Reasonable Promptness
        D.     Fourth Claim for Relief: Americans with Disabilities Act
        E.     Fifth Claim for Relief: Rehabilitation Act

VIII.     REQUEST FOR RELIEF.............................................................................................54

Come now Plaintiffs by and through their attorneys and for their causes of action against the Defendants state as follow:

## I.      PRELIMINARY STATEMENT

1.      Iowa Medicaid beneficiaries with disabilities bring this suit to challenge the policies and practices of the Iowa Department of Human Services and to preserve pre-existing benefits and exceptions to policies so that they may continue to receive the same needed services the state provides to others like them who are institutionalized, and so they may remain in their current, more integrated settings. Last year, Iowa moved responsibility for delivering home and community-based services for Medicaid beneficiaries from a state agency to private, for profit managed care plans. The plans profit when the services they provide to their members cost less that the amount they are paid by the state. The plans initially maintained services for their Medicaid members with severe disabilities who need extensive home and community-based services to be able to live integrated into their communities, with full access to community life to the same degree as individuals not receiving these services, rather than being forced to live in segregated, institutional settings. This year, the plans claimed that they had lost too much money on their Medicaid contracts, and began cutting these members' necessary home and community-based services without any significant changes to their health needs, giving them neither notice nor an opportunity to appeal. The state has violated its legal obligations by failing to correct the illegal practices of its agents.

2.      This case is filed on behalf of adult Iowa Medicaid beneficiaries with intellectual disabilities, physical disabilities, or brain injuries who receive home and community-based services from one of three waiver programs in the state. They are enrolled in a Medicaid managed care plan, and have been denied necessary home and community-based services as a

result of the Defendants' failure to supervise their agent managed care plans to ensure that the plans comply with their legal obligations. As a result of Defendants' illegal practices, vulnerable Iowans with disabilities enrolled in the three waiver programs have been denied due process, are going without needed services, and are at risk of having to become less integrated in their communities, move to more congregate settings, and become institutionalized.

3.     Plaintiffs seek declaratory and both preliminary and permanent injunctive relief for themselves and the class members who they represent to halt the terminations and reductions of home and community-based services by the Defendants and their agents until the Defendants comply with the requirements of the Medicaid Act, the U.S. Constitution, the Iowa Constitution, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

## II.     JURISDICTION AND VENUE

4.     This action arises under Title XIX of the Social Security Act (42 U.S.C. §§ 1396-1396w), the Americans with Disabilities Act (42 U.S.C. §§ 12131-12134), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and the Due Process Clause of the U.S. and Iowa Constitutions. The Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States, and 28 U.S.C. §§ 1343(a)(3) and (4), which give district courts original jurisdiction over suits to redress the deprivation under color of state law of any rights, privileges, or immunities guaranteed by the Constitution or acts of Congress.

5.     This Court has jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure.

6.      Venue is proper under 28 U.S.C. § 1391(b) as all decisions affecting the Plaintiffs were made in Des Moines, Polk County, and all of parties and the acts and omissions complained of below occurred in the state of Iowa.

### III.  PARTIES

#### A.  <u>Plaintiffs</u>

7.      Plaintiff Melinda Fisher is a 61-year old woman with multiple sclerosis.  She does not have a guardian. Melinda has been on the Health & Disability (H&D) waiver since 2013 and uses Consumer Directed Attendant Care (CDAC) services for the areas of daily living and personal care.  Melinda also receives skilled nursing services through an agency that is not paid for through the H&D waiver.  Melinda has been enrolled with AmeriHealth Caritas as her managed care organization (MCO) since April 1, 2016.  Melinda is unable to obtain necessary and appropriate supports and services because Defendants illegally reduced coverage of those services. As a result, she is threatened with harm and the loss of the community integration as is appropriate to her needs. She lives independently in her own home in Cedar Rapids, Iowa.

8.      Plaintiff Shannon G. is a 39 year old woman with intellectual disability, history of seizure disorder, schizophrenia, OCD and other conditions.  She has a guardian.  Shannon is on the Intellectual Disability waiver and receives 24-hour supported community living (SCL) services from a provider-operated setting.  Shannon has been enrolled with AmeriHealth Caritas as her MCO since April 1, 2016.  Shannon is unable to obtain necessary and appropriate supports and services because Defendants illegally reduced coverage of those services. As a result, she is threatened with harm and the loss of the community integration as is appropriate to her needs. She lives with two roommates in Dubuque, Iowa.

9.      Plaintiff Brandon R. is a 23-year old man with intellectual disability, Attention Deficit Hyperactivity Disorder, Kawasaki disorder and conduct disorder. He has a guardian. He is on the Intellectual Disability waiver and receives 24-hour SCL services in a provider-operated setting. He has been enrolled with AmeriHealth Caritas as his MCO since August 28, 2016. Brandon is unable to obtain necessary and appropriate supports and services because Defendants illegally reduced coverage of those services. As a result, he is threatened with harm and the loss of the community integration as is appropriate to his needs. He resides with two roommates in Iowa City, Iowa.

10.      Plaintiff Marty M. is a 38-year-old man with intellectual disability, Down Syndrome, sleep apnea, bilateral hip dysplasia, knee problems, hypothyroidism, and depression. He has a guardian. Marty has received waiver services through the ID waiver since 2010 and with assistance from his guardian, self-directs seven (7) employees to provide his SCL services under the waiver program's Consumer Choices Option (CCO). Marty has been enrolled with AmeriHealth Caritas as his MCO since April 1, 2016. Marty is unable to obtain necessary and appropriate supports and services because Defendants illegally reduced coverage of those services. As a result, he is threatened with harm and the loss of the community integration as is appropriate to his needs. Marty resides independently in Webster City, Iowa.

11.      Plaintiff Misty M. is a 24-year old woman with intellectual disability, bipolar disorder NOS, pervasive developmental disorder, borderline personality disorder and ADHD mixed type. She has a guardian. Misty currently uses the CCO program under the Intellectual Disability waiver and self-directs employees to provide her SCL services. Misty has been enrolled with AmeriHealth Caritas as her MCO since April 1, 2016. Misty is unable to obtain necessary and appropriate supports and services because Defendants illegally reduced coverage

of those services. As a result, she is threatened with harm and the loss of the community integration as is appropriate to her needs. She lives in her sister's home in Clive, Iowa.

12.     Plaintiff Neal Siegel is a 54 year old man with a brain injury. He is on the Brain Injury waiver and receives 24-hour SCL services through CCO under the waiver. Neal has been enrolled with AmeriHealth Caritas since April 1, 2016. Neal is unable to obtain necessary and appropriate supports and services because Defendants illegally reduced coverage of those services. As a result, he is threatened with harm and the loss of the community integration as is appropriate to his needs. Neal resides in West Des Moines, Iowa.

## B. Defendants

13.     Defendant Kim Reynolds is the Governor of the State of Iowa. She is responsible for directing, supervising and controlling the executive branch of state government and for assuring that all federal and state laws are fully executed. She is sued in her official capacity.

14.     Defendant Charles Palmer is the Director of the Iowa Department of Human Services (DHS) and is charged with the overall responsibility for the administration of Iowa's Department of Human Services. Defendant DHS is the designated single state Medicaid agency which "administer[s] programs designed to improve the well-being and productivity of the people of the state of Iowa." Iowa Code § 217.1. DHS is a public entity under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, and its implementing regulations, including 28 C.F.R. § 35.104. DHS is also a recipient of federal funding and is therefore subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the regulations promulgated thereunder. As the director of DHS, Director Palmer is responsible for the effective and impartial administration of Iowa's Medicaid program, I.C.A. § 249A.4. He is sued in his official capacity.

## IV.    CLASS ACTION ALLEGATIONS

15.    This action is brought as a statewide class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

16.    The Class consists of Iowans over the age of 21 who (i) were enrolled in the Intellectual Disability, Brain Injury, or Health and Disability Home and Community-Based Services (HCBS) Waivers on or after April 1, 2016;  (ii) have received HCBS Waivers since April 1, 2016; and (iii) have had, or will have their hours, budgets, or staffing levels for HCBS waivers directly or indirectly terminated, reduced, denied or not provided with reasonable promptness by the Defendants or their agents after April 1, 2016, based on the Defendants and their agents refusal to modify their policies and practices.

17.    The class is so numerous that joinder of all members is impracticable.   As of April 30, 2017, there were 12,058 individuals on Intellectual Disability Waivers, 2,221 individuals on H&D Waivers and 1,463 individuals on Brain Injury Waivers.

18.    Defendant State Officials, through their agents, have engaged in numerous practices that violate the Due Process Clause of the U.S. and Iowa Constitution, the Medicaid Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

19.    There are common questions of law and fact as to the permissibility of the Defendants' policies and practices with respect to denying, reducing, terminating services of adults on the Intellectual Disability, Health and Disability and Brain Injury Waivers. The common questions of law and fact include:

(a)    Have the Defendants violated the Due Process requirements of the Fourteenth Amendment to the U.S. Constitution and the Iowa Constitution by engaging in a pattern

and practice of using vague, subjective, arbitrary and secret criteria for determining the amount of the HCBS and service budgets of class members?

(b)      Have the Defendants and their agents violated the Due Process requirements of Fourteenth Amendment to the U.S. Constitution and the Iowa Constitution by engaging in a pattern and practice of failing to provide advance written notice directly to class members whose requests for HCBS have been denied or whose hours, budgets or staffing levels have been terminated, reduced or not provided with reasonable promptness?

(c)      Have the Defendants and their agents violated the notice and hearing requirements in the Medicaid Act and implementing regulations by engaging in a pattern and practice of failing to provide advance written notice to class members whose requests for HCBS have been denied or whose hours, budgets or staffing levels have been terminated, reduced or not provided with reasonable promptness?

(d)      Have the Defendants violated the Medicaid Act and implementing regulations by engaging in a pattern and practice of implementing a policy and practice that *de facto* rations the coverage for Medicaid enrollees who need HCBS, therefore requiring the Plaintiffs and those like them to delay care until providers willing to provide the services can be located?

(e)      Have the Defendants violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by engaging in a pattern and practice of refusing to modify their policies and practices, including exceptions to policies, which limit the community integration of the Plaintiffs and others like them, thus jeopardizing their ability to stay in their current residential settings and putting them at risk of institutionalization?

20.     The claims of the Plaintiffs as class representatives are typical of the claims of the class.  Plaintiffs and other class members all have had Medicaid-covered home and community based services reduced or terminated by Defendants under the same challenged policies, practices, and procedures. Through their agents, Defendants have terminated, denied, or reduced the Medicaid-covered home and community-based services of each Plaintiff and class member without adequate notice or opportunity to first contest that proposed action via the federally-mandated fair hearing system.

21.     The standards used by Defendant's agents to effect these terminations, denials, and reductions are arbitrary and not ascertainable. Moreover, these terminations, denials, and reductions have created a risk that Plaintiffs will become less integrated in their communities, not be able to maintain their current community living settings, and/or become institutionalized.

22.     The Plaintiffs will fairly and adequately represent the interests of all members of the class. Plaintiffs know of no conflicts of interest among themselves or between their interests and those of class members. All are seeking the same relief and none are seeking monetary damages. Plaintiffs have also selected attorneys with experience in the prosecution of class actions and with experience in disability discrimination and Medicaid laws, with the staff and resources necessary to adequately move this matter forward.

23.     Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members which would establish incompatible standards of conduct for the party opposing the class or could as a practical matter be dispositive of interests of the other members or substantially impair or impede their ability to protect their interests.

24.     Defendants' actions and omissions have affected and will affect the class generally thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

## V. LEGAL BACKGROUND

A. The Americans with Disabilities Act

25.     The Americans with Disabilities Act, codified at 42 U.S.C. §§ 12101-12181 (hereinafter "ADA") was enacted for the purpose of the "elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

26.     Title II of the ADA prohibits discrimination against individuals with disabilities by public entities, including state and local governments, their departments, and agencies. 42 U.S.C. §§ 12131, 12132. "[N]]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. §§ 35.130(b)(1)(iv), 35.130(b)(7), 35.130(b)(8), and 35.130(d).

27.     The ADA requires services, programs and activities of state and local governments to be administered in "the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

28.     The "most integrated setting" means one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible ..." 28 C.F.R. § Pt. 35, App. B (2010). *See also,* Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the ADA and Olmstead v. L. C., available at: http://www.ada.gov/olmstead/q&a_olmstead.htm  (hereinafter "DOJ Olmstead Guidance").

29.     The Supreme Court has interpreted the ADA's integration mandate and held that Title II prohibits unjustified segregation of people with disabilities. *Olmstead v. L.C.*, 527 U. S. 581, 600 (1999).  In so holding, the Court emphasized that unjustified isolation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and that it "severely diminishes the everyday life activities of individuals including family relations, social contacts, work options, economic independence, educational advancement and cultural enrichment." *Id.* at 600-601. The Court concluded that Title II requires public entities to offer services in the most integrated setting possible, including shifting programs and services from segregated to integrated settings, unless such a shift would result in a fundamental alteration of their service system. *Id.* at 607.

30.     The United States Department of Justice has issued interpretive guidance on enforcement of Title II and Olmstead which explains that a "public entity may violate the ADA's integration mandate when it: (1) directly or indirectly operates facilities and/or programs that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities and/or (3) through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs." *See* DOJ Olmstead Guidance at 3, Question 2.

31.     Discrimination based on disability includes discrimination based on the severity or complexity of a person's disability. *See* 28 C.F.R. §§ 35.130(b)(3), 41.51(b)(3); 45 C.F.R. § 84.4(b)(4). The ADA and § 504 regulations prohibit the differential treatment of individuals with disabilities or any class of individuals with disabilities, such as those with more severe or complex disabilities, with respect to their opportunity to participate in or access the full range of

aids, benefits or services in any program operated by a public entity.  *See* 28 C.F.R. §§35.130(b)(1)(ii) and (b)(1)(iv), 41.51 (b)(1)(ii) and (b)(1)(iv); 45 C.F.R; §§ 84.4(b)(1)(ii) and (b)(1)(iv).

32.     Regulations implementing the ADA also provide:  "A public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities. . . ." 28 C.F.R. § 35.130(b)(3).

33.     The ADA regulations further specify that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program or activity unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

34.     The ADA requires state governments and agencies to make reasonable modifications to policies, practices and procedures to avoid discrimination on the basis of disability.  28 C.F.R. § 35.130(b)(7).

B.  Section 504 of the Rehabilitation Act

35.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (hereinafter "Section 504"), prohibits discrimination against individuals with disabilities by any program or activity, including any department or agency of a State government, receiving Federal financial assistance.  29 U.S.C. §§ 794(a) and (b).  "No otherwise qualified individual with a disability […] shall, solely by reason of her or his disability, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance [. . .]."  29 U.S.C. § 794; 45 C.F.R. §§ 84.4(a), 84.4(b)(1)(i), (iv), and (vii);

84.4(b)(2); 84.52(a)(1), (4), and (5).

36.     Section 504 prohibits segregation of people with disabilities into institutions and

requires services, programs and activities of state and local governments to be administered in

"the most integrated setting appropriate to the needs of qualified handicapped persons."  28

C.F.R. § 41.51(d).

37.     Regulations implementing Section 504 also provide:  "A recipient [of Federal

financial assistance] may not, directly or through contractual or other arrangements, utilize

criteria or other methods of administration: (i) that have the effect of subjecting qualified

handicapped persons to discrimination on the basis of handicap; [or] (ii) that have the purpose or

effect of defeating or substantially impairing accomplishment of the objectives of the entity's

program with respect to handicapped persons. . . ."  28 C.F.R. § 41.51(b)(3)(i); 45 C.F.R. §

84.4(b)(4).

38.     Section 504 requires federally funded state governments and agencies to make

reasonable modifications to policies, practices, and procedures to avoid discrimination on the

basis of disability.  29 U.S.C. § 794(a).

C. The Federal Medicaid Program

39.     Title XIX of the Social Security Act, codified at 42 U.S.C. §§ 1396–1396w-2

("Medicaid Act"), establishes the Medicaid program. The objective of the Medicaid Act is to

enable each State to furnish medical assistance to families with children and to aged, blind, or

disabled individuals whose incomes and resources are insufficient to meet the costs of necessary

medical services and to furnish "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1.

40.     Medicaid is a cooperative federal-state program. Participation in the Medicaid program is not mandatory for the states, but once they choose to participate, they must operate their programs in conformity with federal statutory and regulatory requirements and "in the best interests of recipients." 42 U.S.C. § 1396a; § 1396a(a)(19).  The federal agency responsible for overseeing the program is the Center for Medicare and Medicaid Services (CMS).

41.     Each state choosing to participate in the Medicaid program must designate a single state agency responsible for administering the program. 42 U.S.C. § 1396a(a)(5).

D. Home and Community-Based Services in Medicaid

42.     The Medicaid Act authorizes states to obtain HCBS waivers upon approval from CMS. *See* 42 U.S.C. § 1396n(c) (also known as Section 1915(c) of the Social Security Act). States develop these HCBS waivers to meet the needs of individuals who prefer to receive long-term care services and supports in their home or community, rather than in an institutional setting.

43.     State HCBS Waiver programs must: (a) demonstrate that providing waiver services will not cost more than providing these services in an institution; (b) ensure the protection of participants' health and welfare; (c) provide adequate and reasonable provider standards to meet the needs of the target population; and (d) ensure that services follow an individualized and person-centered plan of care. 42 U.S.C. § 1396n(c).  When CMS authorizes a state HCBS waiver, it may waive certain Medicaid Act requirements per the state's request. Only certain provisions of the Act may be waived, and the state must comply with all provisions of the Act that have not been waived. *Id.* If a state has waived a Medicaid provision for the population

served by the waiver as compared to the larger Medicaid population, the state is not exempt from meeting that requirement within the waiver population.

44.     The state Medicaid agency may not delegate its authority over a waiver to another entity and must oversee all waiver administrative and operational functions.

45.     In operating an HCBS waiver, services can be provided through a service provider agency. However, states may also offer a participant-directed model, also known as self-directed model, under which the person has decision-making authority and takes more responsibility for managing their services and supports. 42 U.S.C. § 1396n(c).

46.     An individual waiver participant must have a person-centered service plan developed or reviewed at least annually that is based on a functional assessment of an individual's needs and reflects the individual's strengths, preferences, identified goals, and desired outcomes. As part of the person-centered planning process, the state must ensure that the individual resides in a setting that is integrated in, and supports full access of the individual to, the greater community, including opportunities to engage in community life and receive services in the community to the same degree of access as individuals not receiving Medicaid HCBS. 42 C.F.R. § 441.301(c)(2)-(3).

E. Medicaid Managed Care

47.     With the approval of CMS, states may contract with managed care organizations (MCOs) to provide services to Medicaid beneficiaries. MCOs, typically through a risk contract, provide enrollees with a package of comprehensive Medicaid services in exchange for an actuarially sound prepaid "capitation payment" per enrollee. 42 U.S.C. § 1396u-2(a)(1)(A)(i); 42 C.F.R. § 438.6; CMS, State Medicaid Manual § 2089 (discussing capitation payments).

48.     Contracts between states and MCOs must include provisions that are designed to assure accountability and consumer protection.  42 U.S.C. § 1396b(m)(2), 1396u-2(b); 42 C.F.R. § 438.6(c). When a state contracts with MCOs to deliver Medicaid services to Medicaid beneficiaries, the state Medicaid agency must ensure that each MCO complies with all federal and state laws that pertain to beneficiaries' rights. 42 C.F.R. § 438.100(a)(2). The state must also ensure that each MCO's grievance and appeal system meets the due process requirements in the Medicaid regulations.  42 C.F.R. § 438.228(a).

49.     When a state has delegated the entire responsibility for its Medicaid system to private MCOs, the actions undertaken by the MCOs are done on behalf of the state and constitute state action.

F. Due Process

50.     Because Medicaid is an entitlement, the Due Process Clause of the U.S. Constitution requires the state Medicaid agency and its agents to provide each Medicaid recipient with adequate written notice and an opportunity for an impartial hearing before services are denied, reduced, or terminated. U.S. Const. XIV Amend.    The state actors are also bound by the Due Process Clause of the Iowa Constitution.

51.     The state Medicaid agency or its agents or assigns must provide a Medicaid beneficiary with written notice when it takes any action affecting his or her eligibility or coverage of services. 42 U.S.C. § 1396a(a)(3); 42. C.F.R. §§ 431.206(c)(2), 431.210, 431.220(a).

52.     The notice must contain: (a) a statement of what action the State intends to take; (b) the reasons for that action; (c) the specific regulations that support, or the change in Federal or State law that requires the action; (d) an explanation of – (1) the individual's right to request an evidentiary hearing, if one is available, or a State agency hearing; or (2) in cases of an action

based on a change in law, the circumstances under which a hearing will be granted; and (e) an explanation of the circumstances under which Medicaid is continued if a hearing is required. 42 C.F.R. § 431.210.

53.     When a state contracts with MCOs to deliver Medicaid-covered services to beneficiaries, the state must ensure that the MCOs provide adequate notice and an opportunity for beneficiaries to appeal denials, terminations, and reductions in service. 42 U.S.C. § 1396u-2(b)(4); 42 C.F.R. 438 Subpart F.

54.     Due Process also requires the Medicaid program to be administered so as to insure fairness and to avoid the risk of arbitrary decision-making.

55.     The state Medicaid program and its agents must adopt and implement ascertainable standards and procedures for determining eligibility for and the extent of medical assistance provided.

## VI.  FACTUAL BACKGROUND

A. Iowa's Medicaid Program

56.     The State of Iowa has elected to participate in the Medicaid program and has designated DHS as the single state Medicaid agency. DHS is a department of state government.

57.     The federal government shares the cost of the Iowa Medicaid program by providing funding to the State of Iowa. The federal government pays approximately 57 cents of each dollar spent on Medicaid services in Iowa. 80 Fed. Reg. 73779 (Nov. 25, 2015).

58.     DHS received a $51 million grant from CMS to pay for the Money Follows the Person (MFP) Partnership for Community Integration Project. (Retrieved from DHS website at http://dhs.iowa.gov/ime/members/medicaid-a-to-z/mfp). MFP is a Medicaid long-term care rebalancing program and provides opportunities for individuals in Iowa to move out of

Intermediate Care Facilities for Persons with Intellectual Disabilities (ICF/ID) and nursing homes and into their own homes in the community of their choice. *Id*. MFP provides funding for the transition services and enhanced supports needed for the first year after they transition into the community. *Id.* Individuals with intellectual disabilities or brain injuries living in Nursing Facilities may also qualify. *Id.* MFP has funded 600 Iowans to transition out of an ICF/ID or nursing facility into homes in the community since 2008. (Retrieved from the DHS website at https://dhs.iowa.gov/sites/default/files/MoneyFollows_the_Person_Update_May_1_2017.pdf.)

B. Iowa's Home and Community-Based Service Waivers

59.     Iowa has seven HCBS waiver programs, including the intellectual disability (ID) waiver, the Brain Injury (BI) waiver and the Health and Disability (H&D) waiver.

60.     Iowa allows participants in the ID, BI, and H&D waiver to have their services provided through a waiver model under which an agency is given a specific budget to provide an individual's services. The agency has control over how the services are provided and who provides them, as long as the services are provided consistent with the individual's assessment and person-centered plan, known in Iowa as an individualized service plan.

61.     As an alternative to the agency model, ID, BI and H&D waiver participants may elect to self-direct their services. This can be done either through consumer-directed attendant care service or consumer choices option. The common feature in both of these variations is that the individual or their representative chooses who provides the services, and is responsible for arranging for and managing those services consistent with the individual's assessment and individualized services plan.

1.     Intellectual Disability Waiver

62.     To be eligible for HCBS ID waiver services a person must meet certain eligibility criteria and be determined to need a service(s) available under the program, including having a diagnosis of an intellectual disability and needing an ICF/ID level of care. I.A.C. § 441-83.61(1).

63.     As of April 30, 2017, there are 12,058 Iowans receiving services under the ID Waiver.

64.     There is no cap on total monthly costs associated with the ID Waiver. I.A.C. § 441-83.61(1).  The Iowa Administrative Code states "services shall not exceed the number of maximum units established for each service." IAC 441-83.61(2)(d). "The cost of services shall not exceed unit expense maximums.  Requests shall only be reviewed for funding needs exceeding the supported community living service unit cost maximum.  Requests require special review by the department and may be denied as not cost-effective."   IAC 441-83.61(2)(e).

65.     The number of units or budget amount is based on an initial level of care assessment, the member's needs as determined by the member, and an interdisciplinary team. The Medicaid case manager completes annual reviews to identify the ongoing need for services including completing a comprehensive assessment based on the results of the most recent Supports Intensity Scale (SIS) assessment or of the SIS contractor's off-year review. (441 IAC 83.61(g)(1).

66.     Supported Community Living (SCL) is one service available in the HCBS ID Waiver. SCL services provides up to 24 hours of support per day based on the member's needs. (Home and Community-Based Services Intellectual Disability Waiver Information Packet, Retrieved from DHS website at  https://dhs.iowa.gov/sites/default/files/Comm511.pdf).   SCL includes personal and home skills training services, individual advocacy services, community skills training services, personal environment support services, transportation, and treatment

services.  IAC 441-78.41(1)(a).  This service is designed to assist the member with daily living needs, including developing or maintaining community living skills in and outside the home to allow the person to function in the least restrictive environment.

67.     SCL shall be available at a daily rate or 15-minute rate to members for whom a daily rate is not established. IAC 441-78.41(1)(b).  The daily unit applies to members who live outside of their family, legal representative, or foster family home and for whom a provider has primary responsibility for supervision or structure during the month.  *Id.* Provider budgets also can establish a daily rate when members who receive on-site staff supervision for eight or more hours per day as an average over one month.  IAC 441-78.41(1)(f).

68.     The waiver as approved by CMS does not contain an individual cost limit.

2.     Health and Disability HCBS Waiver

69.     To be eligible for a Health and Disability (H&D) waiver, an individual must meet certain eligibility requirements set forth in the Iowa Code.  One of these requirements is that a person must be certified as being in need of nursing facility or skilled nursing facility level of care or as being in need of care in an intermediate care facility for persons with an intellectual disability.  I.A.C. § 441-83.2(1)(D).  DHS makes the initial eligibility determination.  *Id.*

70.     An individual eligible for an H&D waiver must have a service plan approved by DHS, which is based on a comprehensive assessment and the individual's needs and desires identified by the individual and his or her interdisciplinary team.   I.A.C. § 441-83.2(2).

71.     As of April 30, 2017, there are 2,221 Iowans receiving services under the H&D Waiver.

72.    There are limits on the total monthly costs of the H&D waiver services for a member depending on their level of care determination.    If the member needs the following levels of care, then the monthly cap for H&D services is as follows:

- Nursing Level of Care, monthly cap $959.50;

- Skilled Level of Care, monthly cap $2,792.65;

- ICF/ID Level of Care, monthly cap $3,742.93.

IAC 441-83.2(2).

73.    The waiver as approved by CMS does not contain an individual cost limit.

74.    Prior to DHS transitioning Iowa's Medicaid system to managed care on April 1, 2016, DHS granted exceptions to policy which allowed the cap to be exceeded if the service needs of the beneficiary cost more than the established caps. Iowa Code § 17A.9A    Iowa Code section 17A.9A allows any person to petition for a waiver or variance from the requirements of a rule.

3.    Brain Injury HCBS Waiver

75.    To be eligible for brain injury waiver services a consumer must meet eligibility criteria and be determined to need a service allowable under the program, including having a brain injury and needing skilled nursing facility or an intermediate care facility level of care. I.A.C. 441-83.82(1).

76.    As of April 30, 2017, there are 1,463 Iowans receiving services under the BI Waiver.

77.    An individual eligible for the BI waiver must have a service plan approved by DHS, which is based on information provided to DHS and the individual's needs and desires identified by the individual and his or her interdisciplinary team and including a review of the

person's comprehensive assessment.   I.A.C. § 441-83.82(2)(a) and (a)(1).   An initial assessment is completed to review the individual's current functioning in regard to the individual's situation, needs, strengths, abilities, desires and goals.   Thereafter, DHS or the individual's MCO assess the individual annually and certify the need for long-term care services.   441 IAC 83.87(3).

78.     The total cost of brain injury waiver services, excluding the cost of case management and home and vehicle modifications, shall not exceed $3,013.08 per month.   IAC § 441-83.82(2)(d).

79.     Prior to DHS transitioning Iowa's Medicaid system to managed care on April 1, 2016, DHS granted exceptions which allowed the established cap to be exceeded if the service needs of the beneficiary cost more than the cap.

80.     The waiver as approved by CMS does not contain an individual cost limit.

C. The Implementation of Medicaid Managed Care in Iowa

81.     On April 1, 2016, former Governor Terry Branstad decided unilaterally to deliver Medicaid services through private managed care plans in Iowa.

82.     Former Governor Branstad claimed that turning over the delivery of services in the State's Medicaid system to for-profit contractors would increase efficiency and cost savings. He stated that the State would save $51 million during the first 6 months of implementing Medicaid managed care.

83.     Upon information and belief, former Governor Branstad and Defendant Palmer promised individuals, like the Plaintiffs and others similarly situated, that their Medicaid-funded long-term services and supports would not be changed for at least two years.

84.     Although CMS delayed the implementation of the managed care twice on the grounds that Iowa was not ready to privatize its managed care system, CMS finally approved Iowa's conversion to managed care as of April 1, 2016.

85.     DHS contracted with three private MCOs to deliver Medicaid-covered services to Medicaid beneficiaries in Iowa: AmeriHealth Caritas Iowa, Inc., Amerigroup Iowa, Inc. and United Health Care Plan of the River Valley, Inc. DHS's contracts with these MCOs are collectively referred to as the "Contracts."

86.     The stated purpose of the Contracts is to "provide high quality health care" for the Iowa Medicaid program, as well as some other health care programs in Iowa.  (Contracts, § 1.2).

87.     The Contracts require the MCOs to "comply with all applicable federal, state and local laws, rules, ordinance, regulations, orders, guidance and policies in place at contract execution, as well as any and all future amendments, changes and additions to such laws as of the effective date of the change."  (Contracts, § 2.13.4).

88.     The Contracts require the MCOs to "provide high quality health services in the least restrictive manner appropriate to a member's health and functional status."  (Contracts, § 1.2)

89.     The Contracts require the MCOs to "ensure that all services are provided in a manner that facilitates maximum community placement and participation for members that require LTSS [long-term services and support]." (Contracts, Scope of work, § 4.1)

90.     The Contracts further state that DHS is "dedicated to serving individuals in the communities of their choice with the resources available and to implementing the United States Supreme Court's mandate in *Olmstead v. L.C.*" and that "funding decisions by [the MCOs] shall

consider individual member choice and community-based alternatives within available resources to promote [DHS's] goal of maximum community integration." *Id.*

91.     The Contracts also prohibit the MCOs from "reduc[ing] the enhanced staffing arbitrarily or without a supporting reduction in clinical need as documented by provider records for members who require individualized, enhanced staffing patterns to support them in a less restrictive setting." *Id.*

92.     Under the managed care plan, waiver participants are only provided short-term reauthorizations of their services in addition to, or in place of, annual reviews. The Iowa Administrative Code does not provide for 90-day reauthorizations for individuals receiving HCBS waiver services, but only addresses annual reviews or re-determination if the MCO becomes aware that the member's condition has changed.  I.A.C. §441-73.11.

93.     Iowa Code § 17A.9A allows any person to petition for a variance from the requirement of any rule.

94.     Prior to Iowa's transition to managed care, many HCBS waiver recipients used the variance process, also referred to as an "exception to policy" to obtain services that were outside normal policies, but were nonetheless medically necessary.

95.     Upon the transition to managed care, the Contracts allow the MCOs to have an exception to policy process, which is essentially a reasonable modification to policies and procedures under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, and their implementing regulations:

> "The Contractor may operate an exception to policy process. Under the exception to policy process, a member can request an item or service not otherwise covered by the Agency or the Contractor. Exceptions to policy may be granted to Contractor policies, but they cannot be granted to federal or State law and regulations. An exception to policy is a last resort request."

(Contracts, Section 8.15.9 Exception to Contractor Policy Process).

96.     To promote DHS' community integration goal, DHS requires the MCOs to modify its policies and procedures if the monthly cost of services is above the average cost cap set forth in the Iowa Code.  Specifically, the contracts have a three-step process:

- "The MCO must continually monitor HCBS waiver member's expenditures against the waiver average aggregate monthly cost cap, and work with members reaching their waiver average aggregate cap to identify non-waiver services that are available and appropriate to be provided in the event the waiver average aggregate cap is met to assist the member in remaining in the community and prevent or delay institutionalization."

- "If the Contractor determines a member's needs cannot be safely met in the community and within the aggregate monthly costs defined in the HCBS waiver in which the member is enrolled, the Contractor shall determine if additional services may be available through the Contractor's own Exception to Policy process as described in Section 8.15.9, to allow the member to continue to reside safely in the community".

- "In the event the Contractor denies an Exception to Policy and determines the member can no longer have his or her needs safely met through a 1915(c) HCBS waiver, and the member refuses to transition to a more appropriate care setting, the Contractor shall forward this information to DHS for review."

Contracts, Section 4.4 1915(c) HCBS Waivers for Disenrollment (4.4.5) for Service Needs (4.4.5.2).

97.     DHS has declared that the MCO's do not have to grant an exception, and similar to the case in fee for service, there are no member appeal rights if an exception is not granted.

98.     After Iowa's Medicaid system was privatized on April 1, 2016, the Defendants and their agents engaged in a pattern and practice of reducing the costs they paid for HCBS waiver services without regard to the needs and preferences of HCBS waiver recipients whose needs had not changed.

99.     The waiver documents, however, describe the exception to policy process as follows: "The MCOs operate an exception to policy process for their members. In the event an MCO denies an exception to policy and determines the member can no longer have his or her needs safely met through the 1915(c) waiver, the MCO is required to forward this information to DHS.  In addition, MCO members have the right to appeal any decision made by the MCO . . . ." (Application for 1915(c) Home and Community Based Services Waiver—Health and Disability Waiver, p. 184-185, Application for 1915(c) Home and Community Based Services Waiver—Intellectual Disability Waiver, p. 201 and Application for 1915(c) Home and Community Based Services Waiver—Brain Injury Waiver, p. 185).

100.    Prior to the advent of managed care on April 1, 2016, DHS approved budgets and any exceptions for HCBS Waiver recipients.

D. The Crisis for the Plaintiffs

101.    After April 1, 2016, the Defendants and their agents engaged in a pattern and practice of reducing the budgets for the Plaintiffs and others similarly situated receiving services through an agency provider with no showing that their covered needs had in any way decreased.

102.    For instance, upon information and belief, the Defendant's agent, AmeriHealth, sent a letter (the "AmeriHealth Directive") to all of the agencies providing HCBS 24 hour SCL

services, stating that, as of April 1, 2017, AmeriHealth  would pay the smallest dollar amount allowed under AmeriHealth's contract with DHS for the members.

103.    The proposed reduction of the contracted rate is not based on current reimbursements or actual costs but from cost audited reports from previous years.  This results in a reduction of funding to 2013 levels and will not cover current costs.  As a result of the reductions and denials, the Plaintiffs and other similarly situated have or will have their individual budgets and services reduced or changed, regardless of their individual needs as identified in assessments, interdisciplinary team meetings and service plans and the fact their conditions and needs have not changed.

104.    The Defendants have also engaged in a pattern and practice of cost cutting measures with respect to the Plaintiffs and others similarly situated who are receiving HCBS Waiver Services through the self-directed care models of Consumer Choices Option and/or Consumer Directed Attended Care.

105.    The Defendants have cut the budgets of members, without regard to medical necessity, or their needs or preferences based on assessments, the recommendations of their interdisciplinary teams or their individualized services plans.

106.    The Defendants have cut the budgets of members even though their needs and conditions have not changed.

107.    The Defendants have refused to grant exceptions to policy and approve budgets over the cost caps for members even though DHS granted exceptions to policy before the advent of managed care to the Plaintiffs and others similarly situated.

108.    Upon information and belief, the Defendants did not provide advance written notice of these budget cuts to the members which adequately explained the factual and legal

reasons for the cuts, a description of their appeal rights including the right to keep services in place pending an appeal and fair hearing.

## Plaintiff Melinda Fisher

109.    Plaintiff Melinda Fisher is a 61-year old woman diagnosed with multiple sclerosis (MS).  Melinda's MS has progressed to the point that she can no longer walk and uses a wheelchair.  Melinda no longer has the use of her left arm and hand, and has very limited use of her  right arm and hand.  She has no bowel or bladder control and requires assistance with almost all daily living tasks including toileting, dressing, medication management, housekeeping, personal care, shopping, meal preparation, transferring, completing paperwork, scheduling and transportation to appointments and money management.  Although Melinda received care in a nursing facility for a short period of time in 2013, Melinda currently lives in her own home independently.

110.    Melinda is on the H&D waiver with a current level of care of nursing facility (NF).  This NF level of care limits her total monthly cost of waiver services to $959.50.   In 2015, Melinda received approval from DHS for an exception to policy to increase her budget to $2544.00 specifically to allow her to receive CDAC services up to 120 hours (or 480 units at $5.30 per unit with one unit being 15 min.).

111.    Melinda has been on the H&D waiver since 2013 and uses CDAC services to assist her in the areas of daily living and personal care.  Melinda also receives Medicaid skilled nursing services that are not paid for through the H&D waiver.

112.    Melinda has been enrolled with AmeriHealth as her MCO since April 1, 2016.

113.    Consistent with regulations, Melinda's needs are assessed annually to create a service plan for her. However ,Melinda's services are only being approved in 90-day increments, and her case manager must continually submit requests for services every 90 days.

114.    Melinda had 480 units of provider CDAC in previous year, but always had a need for additional services.  At that time, she had a friend who provided CDAC-like services but was privately paid by Melinda.

115.    On September 2, 2016, a request was submitted to increase Melinda's CDAC units from 480 to 782 as Melinda lost use of her right arm and hand and needed more time to accomplish tasks, such as eating, drinking, and other daily living skills.  The MCO approved 782 units of CDAC in mid-October.  The increase in CDAC units better met Melinda's needs. Melinda received an increase in the following services: bathing/grooming (10 min increase), meal prep and feeding (30 min increase), toileting (30 min), transferring and ambulation (20 min), essential housekeeping (10 min), minor wound care (35 min), and medication assistance (5 min).  The increase, for example, helped Melinda with having more baths per week. Melinda wanted to improve her hygiene and have a full, proper bath more often versus just half baths every other day as she wears incontinence briefs daily and to avoid any skin irritations.

116.    Later in October, Melinda's circumstances changed when she lost private pay resources which she had used to pay her friend who was assisting her during the hours her CDAC providers were not present.  Melinda's existing provider agency who was providing the 782 units indicated it could cover the service gap with an increase in units to 1000.  1000 units of CDAC would give Melinda 250 hours per month or 8 hours of assistance per day.  The MCO approved 1000 units for the period of 11/1/17 through 12/31/16.

117.    As a result, Melinda had additional assistance with meal preparation and feeding, toileting, transferring and ambulation, and minor wound care.  She also was able to add 72 minutes to essential transportation (5 days per month) to have staff transport and accompany her to medical appointments.

118.    Melinda's case manager submitted a request for 1000 units of CDAC for the period of January 1, 2017 through March 31, 2017.  On December 12, 2016, the MCO denied the continued use of 1000 units for the period 1/1/17 through 4/1/17 and only approved 480 units, even though Melinda's needs had not changed.

119.    At a meeting with the case manager on December 14, 2016, the case manager recommended to Melinda and her family that she seek nursing home placement as the MCO would not provide adequate HCBS to meet her needs in the home.  Melinda's family reluctantly reviewed three nursing facilities but found they were either not suitable to place Melinda or had waiting lists of up to 2 years.  As Melinda is opposed to moving to a nursing facility, the family did not pursue placement and a friend is volunteering her time to help Melinda without pay while Melinda appeals to the MCO.

120.    Melinda's brother called the MCO's member services with Melinda's verbal consent and requested to file an expedited appeal on December 16, 2016.  Melinda's brother spoke with a member services representative who incorrectly stated the appeal request must be filed by Melinda's case manager.  Melinda's case manager does not have the responsibility to file appeals on behalf of members.  Members must file appeals through the MCO. 42 C.F.R. §438.408(f)(1); IAC §441-73.12.

121.    The MCO generated a letter for Melinda dated January 5, 2017, approving 480 units of CDAC but denying the request for the 1000 units per month.  Melinda's medical power

of attorney received the letter on January 17, 2017.  However, her CDAC services were reduced beginning on January 1, 2017, 5 days prior to any written notice even being generated by AmeriHealth.

122.    Melinda filed an appeal with the MCO on February 14, 2017, but it was rejected as being filed untimely.  Melinda filed a request for a state fair hearing and a hearing was held on April 24, 2017, on the sole issue of whether the MCO correctly denied the first-level appeal because it was not timely filed.  The administrative law judge held the appeal was not filed timely.  Melinda has filed an appeal of the administrative law judge's decision.  This appeal is still pending.

123.    On June 7, 2017, Melinda was advised by her case manager that the MCO plans to further cut her hours to 179 units per month beginning July 1, 2017, in order for Melinda's services to cost under the H&D nursing level of care cap of $959.50.   The proposed cut to 179 units is only 44.75 hours per month or 1.44 hours per day.

124.    Melinda is nearly totally dependent according to her service plan and 1.44 hours a day cannot provide her assistance with meals, feeding, cleaning, bathing, grooming, dressing, incontinence issues, and transferring.

125.    If Melinda's CDAC services are reduced to 179 units per month her provider would not be there for her during the week.  Melinda would have to stay in bed from 10:30 p.m. till 6:30 p.m. the following night, without water or food, no one to change her incontinence briefs, empty her catheter bag, or give her medications. She also would not have any assistance scheduling her doctor appointments and transportation, or anyone to accompany her to her appointments, complete her forms, purchase her groceries, etc.

126.    Melinda does not want to leave her home and be placed in a nursing facility.  Her physicians support her continuing to live at home with appropriate level of services to meet her needs.

### Plaintiff Shannon G.

127.    Plaintiff Shannon G. is a 39-year old female with intellectual disability, schizophrenia, OCD and a history of seizure disorder.  She also has other diagnoses, including Torticolis, which causes a risk of choking. Shannon has a history of silent aspiration and has a very detailed care plan of staff supervision when eating.

128.    Shannon has a history of institutionalization, including placement in a residential care facility (RCF). Her last hospitalization due to psychiatric issues was from January 21 through March 6, 2015.  Shannon is currently court ordered to outpatient psychiatric care and her mental health diagnoses are treated through psychiatric medications and ECT therapy.

129.    As a result of her disabilities Shannon requires 24-hour supervision, and individual direct assistance to complete tasks throughout her day. Each task must be broken down into individual steps and prompted for Shannon to be able to complete.

130.    Shannon uses services under the Intellectual Disability waiver including 24-hour site based SCL supports, day habilitation and transportation provided by Hills and Dales provider agency. Shannon's lack of judgement and poor decisions leave her vulnerable and subject to exploitation and she has a history of being sexually exploited.  Shannon is supervised at all times and she is always within sight of staff unless she is in the restroom or in her bedroom. She has highly trained provider staff that can adjust to her needs, and assist in keeping her healthy and safe.

131.    Shannon's mental health needs require that she have a very structured and calm environment. Until recently, Shannon had been living in a two person home and receiving significant hours of one-on-one services. There was always one or two staff present in Shannon's home at a time. Because of Shannon's high needs she had been approved to receive the maximum amount of allowable funding under the waiver.

132.    Following the transition to managed care, Shannon's MCO continued her funding amount until the fall of 2016, when they abruptly reduced her budget by dropping her SCL service to the floor funding level, even though her needs had not changed. Only Shannon's provider was notified that the MCO would be reducing her budget and the payments the provider would receive to provide Shannon's care and would not consider any request for Shannon to continue receiving the same funding as she had been receiving for many years.  As a result, on September 30, 2016, the provider agency was forced to make adjustments including having Shannon move out of her home to live in an apartment with two (2) consumers without an increase in staff, due to her reduced budget.

133.    This move and increase in roommates has increased Shannon's stress and exacerbated her mental health symptoms.   The addition of the roommate has resulted in 4-5 people being in Shannon's home at all times, and this increase in noise and stimuli has intensified Shannon's stress and exacerbated her mental health symptoms. Additionally she has lost skills that were present before the move. Because Shannon's access to one-on-one staff time has been reduced as a result of the increase in roommates, she is not as independent in activities of daily living as she once was, and because the reductions have increased the staff/client ratio, her participation in social and other activities has decreased.

134.    Shannon she spends much of her time at home alone in her room. The noise and increased stimuli in the common areas causes Shannon to spend quiet time in her bedroom listening to music, drawing, or sleeping.

135.    Shannon has been notified by her provider agency that they may have to make additional changes to her services due to cuts in the rates which will reduce client's individual service budgets.

136.    Shannon does not want to move again, have any additional roommates added to her home, have additional cuts to her services, or have further decreases in her community integration.

### Plaintiff Brandon R.

137.    Plaintiff Brandon R. is a 23-year old man with intellectual disability, Attention Deficit Hyperactivity Disorder, Kawasaki disorder and conduct disorder.  He is on the ID waiver.

138.    Brandon receives HCBS services  under the waiver, including 24-hour SCL at a daily rate provided by Caring Hands & More in Iowa City, Iowa.  His SCL services include reminders and direction to develop and maintain a daily routine that includes cleaning, hygiene, and socialization.  Brandon has 24-hour supervision due to needing more attention, redirection, and supervision including working on his aggressive behaviors and impulsiveness and learning appropriate behavior in the community.

139.    Brandon has been abused in his early years. He lived in a shelter at age 13, and then transitioned to foster care and residential care as an adult.  Brandon has been hospitalized in a psychiatric unit more than 10 times in his life.  Brandon also had several assault charges as a result of his behaviors.

140.    Brandon lived in Country View residential care facility (RCF) since he was 13 years old in 2009 until August 2015.  He was discharged following an incident that led to his arrest for assault.

141.    Following his discharge, Brandon transitioned to a community-based apartment with SCL services provided by the agency, Caring Hands & More. Brandon's transition was aided by the use of the Money Follows the Person (MFP) program and he had an enhanced budget for one year with MFP.  Brandon's MFP funding ended on August 27, 2016, and he began coverage under AmeriHealth on August 28, 2016.

142.    In October, 2016 the MCO notified the provider that they would be reducing Brandon's budget for SCL on a quarterly schedule.  Brandon's current budget was based on the provider's contracted daily rate of $364.11 for one year and the MCO proposed to reduce the budget over time to be based on the floor SCL rate of $196.05.  From October 20, 2016 through November 2016, the provider attempted to negotiate with the MCO to maintain Brandon's budget, as Brandon continues to need a higher level of services and supervision and cannot be transitioned into rooming with additional individuals due to his behavioral needs. The managed care company would not negotiate and demanded the provider reduce Brandon's budget to reflect the lower, floor daily rate.

143.    This budget reduction was not a result of any new comprehensive assessment or evidence of a change in Brandon's medical necessity for this level of services and supervision.

144.    The provider indicated that Brandon's services cannot be met if Brandon's individualized budget is cut by nearly 50% as the MCO intends.  The provider sent a discharge notice dated December 30, 2016 to Brandon's legal guardian indicating they would discharge

Brandon on February 27, 2017, as they cannot continue to service Brandon's higher needs at the budget proposed by the managed care company.

145.    Brandon's case manager has sought new HCBS placements with SCL services for Brandon but as of the current date, no suitable placements have been found.  Only one agency had demonstrated interest in accepting Brandon but later rescinded citing Brandon's criminal history.  Brandon's guardian does not want to see Brandon placed in an ICF/ID as it was not successful in the past.

146.    The reduction of Brandon's enhanced rate and individualized budget for his needs will have a significant impact on his ability to remain in the community where he has dedicated care and support in keeping him safe.   Brandon has a history of property destruction, physical aggression, inappropriate sexual behavior and elopement. He has spent significant time in psychiatric hospitalizations in the past and is currently under probation for an assault.

147.    Brandon has been the most successful in his current placement which has been the least restrictive environment of his adult life.  Since transitioning into the community setting with HCBS supports from the ICF/ID, he has moved from needing 24-hour 1:1 staffing ratio and now only requires 1:1 staffing for 15 hours per week.   A lower budget does not fund the appropriate level of staffing and may force Brandon into having additional roommates, which is not recommended and has not worked out in the past.

148.    The discharge from his placement is against the advice of Brandon's behavior analyst, medical and psychiatric physicians.  Brandon has a history of abuse in his early childhood with his first psychiatric evaluation at age 6.  He has had four psychiatric hospitalizations in the past five years.   His psychiatric team writes in a letter that if he does not remain in his current placement with appropriate level of services, they would expect him to

"end up in an institutional setting or psychiatric hospital with few to no agencies willing to accept him."

149.    Brandon remains with Caring Hands & More at this time pending discharge to another placement.  Brandon does not wish to be removed from his apartment and wants SCL services to be continued to be provided by Caring Hands & More as it has been his most successful placement to date in his entire life.

### Plaintiff Marty M.

150.    Plaintiff Marty M. is a 38 year old man who is diagnosed with mild intellectual disability, Down Syndrome, sleep apnea, bilateral hip dysplasia, knee problems, hypothyroidism, and depression.  Marty had hip replacement surgeries on both hips in 2015 and 2016.

151.    Since 2000, Marty has tried different living situations to meet his needs.  He has attempted to live with roommates in an apartment with services and has also lived in a group home with 24-hour supervision.  These living arrangements were not suited to Marty's needs due to complications with staff and roommates.  Marty had an increase in his depression, acting out, an increase in medication, and an increase in mental health therapy utilization during these unsuccessful placements.

152.    Marty has lived independently in a duplex since 2010.

153.    Marty has received waiver services through the ID waiver since 2010 and has elected to participate in the waiver program's Consumer Choice Option (CCO).  Marty self-directs seven employees under CCO and uses supported community living (SCL) as his category of service under CCO.  Marty also attends a day habilitation program.

154.    Marty receives SCL services every evening where he works on healthy eating, exercising, running errands, making sure he is taking his medications, help with bathing,

toileting, making sure he is wearing his bi-pap, and helping him to get around in his home. Marty frequently awakens in the middle of the night and at times needs assistance with getting to the restroom. Marty has physical issues with his knees and hips which makes it harder for him to do things on his own.

155.    Marty requires 13 hours of SCL services for supervision and assistance when he is home alone during the late afternoon, evening, and overnight hours.  His CCO employees provide supervision and assist with maintaining healthy eating, daily hygiene, exercise, completing errands in the community, and assistance with his sleep apnea equipment.  Marty is only home alone for brief periods of time.

156.    In February 2015, The Director of the Department of Human Services granted Marty an "exception to policy" which allowed him to have an individual CCO budget that exceeded the established daily rate for SCL.  The daily SCL rate at the time of the exception was $134.31. The Director approved Marty's request for a higher daily rate of $274.48 for SCL services, effective February 1, 2015 through January 31, 2016.  This exception allowed Marty to receive 13 hours of SCL services for supervision and assistance, to be provided in the afternoons, evenings, and overnights, when he is not at day habilitation.

157.    When the transition to managed care took effect on April 1, 2016, AmeriHealth assumed responsibility for managing Marty's waiver services per its contract with Defendants. The MCO approved Marty's SCL budget at the daily rate of $274.48 from April 1, 2016 to March 1, 2017.

158.    On February 13, 2017, the MCO issued a written notice to Marty denying his regular request to continue his daily rate of $274.48 and a total monthly CCO budget of $8508.88.  The notice of action indicated that the denial of the requested rate was due to limits of

the daily rate set by the Iowa Administrative Code, and the MCO could only approve a daily SCL rate of $173.43 creating a total monthly budget of $5,376.33 beginning March 1, 2017. The February 13, 2017 letter had a postmark of February 17, 2017, and was received by Marty on February 23, 2017.

159.    The denial and reduction of his CCO budget did not review whether the higher budget provided for necessary services nor was there a review of whether any additional services could be provided, pursuant to the MCO's own Exception to Policy process, to allow Marty to reside safely in the community.

160.    Marty timely filed an appeal through the MCO and made a request that his benefits continue at the higher budget pending the appeal process.

161.    The MCO did not honor the request to continue benefits pending the appeal and only conceded that benefits should have continued on April 28, 2017, prior to a scheduled administrative law state fair hearing.

162.    As of the date of hearing on May 8, 2017, Marty was still receiving the lower budget amount.  In order to maintain his level of services and to continue to pay his CCO employees, Marty used money from his own savings account to pay the difference in his employee wages.  In addition, his 70-year old mother worked 28 hours without pay to reduce the overall cost of services to Marty.

163.    Marty's interdisciplinary team including his case manager completed a County Community Service Case Management Individual Comprehensive Plan Addendum dated January 30, 2017.  The Addendum stated that it "is vital that Marty have his current level of support with CCO staff to live as successfully as possible."

164.    Marty lives in a smaller community where qualified, trained CCO employees are hard to find at the available rate of pay and the need for staff to be willing to work overnight shifts.  His current CCO providers have indicated they are unsure if they would continue to work for Marty if the hourly pay is cut.  Marty's mother cannot provide services for Marty on a continuing basis.

165.    On May 15, 2017, an administrative law judge issued a proposed decision ordering that the MCO must review if Marty's needs can be safely met using a budget based on the lower daily rate for SCL services, and if not, whether other non-waiver services are available, or whether it is appropriate to make additional SCL services available to him under an Exception to Policy per their contract with the Defendants.  The proposed decision also ordered the MCO to retroactively authorize continuing benefits.

166.    On May 23, 2017, Marty's MCO case manager and case manager supervisor requested Marty and his guardian sign a CCO budget for June at the lower capped rate, in total disregard for the administrative law judge's proposed order.  On June 1, 2017, the MCO hand-delivered a written notice stating they will only approve the maximum allowable rate of $5376.33 per Iowa Administrative Code and will not approve an exception. Marty is at constant risk of service cuts and budget reductions by his managed care company.

167.    Marty does not want to move from his home and return to a group home setting. His previous attempts at living in a group home were unsuccessful. They led to an increase in his negative behavior, depression, getting up during the middle of the night to eat, and to leaving the apartment during the night. This led to his roommates not getting sleep. Due to Marty's behavior, he lost a number of friends. Marty also had an increase in his medication and an increase in

therapy visits during this time. Marty's overall quality of life has improved in his current situation and he does not want to return to a less integrated living environment.

**Plaintiff Misty M.**

168.     Plaintiff Misty M. is a 24 year old female with intellectual disability, bipolar disorder, pervasive developmental disorder, borderline personality disorder and Attention Deficit Hyperactivity Disorder mixed type.  Misty is on the Intellectual Disability waiver.

169.     Misty has a long history of out-of-home placements from a young age, including multiple foster care home placements interspersed with periodic placements in a psychiatric medical institute for children.  As an adult, Misty has tried group home placements and was unsuccessful in a host home program in 2013.

170.     When Misty was living in an agency supervised HCBS home, Misty had roommates with their own challenges and behaviors. This situation prevented Misty from doing some activities when others were having behavioral issues.  Misty had trouble living with roommates and had conflicts with staff. Misty's skill building and independence were also limited as staff would do tasks for Misty when she was defiant rather than work through her challenges and encourage her to complete the tasks herself.  Misty was charged with assault for a behavioral incident that involved hitting and biting staff.  The staff called police and she spent the night in jail.

171.     Misty also lived in a host home with a non-family member from 2013 to July 2014.  Following discharge from the non-family member host home in July of 2014, Misty moved into her sister's home and used SCL services under the Consumer Choice Options program under the ID waiver.

172.     Her sibling later quit her full-time corporate job to become a trained host home provider in December of 2015 to provide Misty with appropriate services to meet her needs. Misty returned to using 24-hour daily SCL services under the host home program.  In a sibling host home, the individual with a disability lives with an adult sibling who is a licensed and trained provider and has contracted oversight through an agency provider.

173.     Misty obtained an exception to policy from Iowa's Department of Human Services (DHS) in December 2015 to have her budget increased to allow her sibling host home provider to use the daily SCL rate at $175.13.  Without the exception to policy, the budget assumes that the supported community living services are only available at 15-minute rate intervals as the daily rate is not allowed for members living in the home of their family (see IAC §441-78.41(b)(1)).  Iowa DHS interprets "home of their family" to include sibling host homes.

174.     Misty's placement with her family has allowed her to participate in more activities in the community than her previous placements.   The family makes it a priority to expose her to activities she enjoys and to try different outings and activities as it helps reduce her negative behaviors.  She attends Special Olympics, Dance Without Limits, and providers Link and Easter Seals leisure programs.  She attends church and outings such as Night to Shine.  She is involved in a program called Best Buddies Iowa.  She participates in activities such as going out to eat, bowling, and birthday parties with friends over.  She is now able to take vacations with her family and attend family holiday gatherings. Before she could attend only occasionally.

175.     Misty was assigned to AmeriHealth on April 1, 2016.  The MCO indicated they would not be granting or extending the existing exceptions to policy to increase Misty's budget to allow her sibling to use the daily SCL rate for the provision of 24-hour supervision of Misty.

Misty's case manager secured the MCO's approval to continue to use her increased budget until September 2016 to help Misty switch to the use of the CCO program and SCL under the waiver.

176.    From September 1, 2016 to March 28, 2017, the MCO approved 1528 units or approximately 12 hours per day of SCL services, despite the fact Misty requires 24-hour supervision. Misty also attends day habilitation Monday through Friday from 8:45am to 2:30pm using her ID wavier funds.  Day habilitation are services that help develop or maintain life skills and community integration.

177.    In March 2017, AmeriHealth reduced Misty's 1528 units of SCL under the CCO program to 960 units, incorrectly stating there is a cap on units per month per Iowa Administrative Code and Misty cannot exceed the monthly cap.  The Iowa Administrative Code at 441-78.41(1)(g)(2) states 20,440 15-minute units are available per state fiscal year except a leap year when 20,496 15-minute units are available.   Misty's request is under the yearly total.

178.    A reduction of Misty's SCL units to only 960 per month would mean that Misty receives less than 8 hours of service per day.

179.    Misty was informed of the cuts by her case manager.  The MCO stated it sent Misty a written notice on March 30, 2017 regarding the reduction.  Misty has never received this March 30 letter.

180.    Misty's sister called AmeriHealth on April 19, 2017 to file an expedited oral appeal based on the case manager's information.  It is during this call that Misty's sister learned a letter was allegedly sent to Misty dated March 30.  Misty's sister requested a copy of the March 30 letter be sent and verified their mailing address.  The MCO stated they would mail a copy of the letter but no letter has ever been received.  Although the March 30 letter was never

received, Misty's sister asked to have the benefits continue at the higher amount during the appeal but was advised she did not file within 10 days of the letter and her request was denied.

181.    On April 20, 2017 Amanda Butters, Member Appeals Coordinator with the MCO called Misty's sister to state they would not expedite the appeal and would review it as a regular appeal, and under those timelines.  Misty's sister filed a written appeal dated April 21, 2017 and provided additional information in a letter dated April 26, 2017.

182.    On May 18, 2017, the MCO requested the member consent to an extension of time for the MCO to make a decision on the appeal request.  Misty consented on May 19, 2017 to the extension.

183.    The MCO sent a notice dated June 6, 2017, stating they are upholding the denial despite its admission that "Misty requires 24 hour monitoring, supervision and support." The denial stated the request for 1528 units of Consumer Choice Option at the hourly rate exceeded the monthly maximum of 960 units per month permitted by Iowa law.

184.    As a result of the cuts to Misty's CCO SCL units, Misty has had to let  two of her CCO employees go, and had to cut the paid hours for other employees. Misty continues to attend day habilitation, but her family is now compelled to provide uncompensated supported community living services despite her documented need for 24-hour services.  This arrangement is not sustainable and Misty may need to return to ICF/ID placement.

185.    Misty does not want to move out of her sibling's home.  Misty's dream was to live with her family and being forced to leave family most will likely increase her aggression and negative behaviors in any new placement.  Facility placement is against medical advice and her psychiatrist and therapist have indicated Misty's negative behaviors will, in fact, increase and

likely subject her to bouncing from placement to placement, as other providers have not been able to handle her in the past.

### Plaintiff Neal Siegel

186.    Plaintiff Neal Siegel is a 54 year old male who acquired a brain injury in November of 2013 after being the victim of a hit and run by a car while he was on his bicycle. As a result of the accident, he suffered a stroke and experiences hemiparesis on one side of his body. He also lives with chronic pain and has diagnoses of muscle spasticity, anxiety, generalized weakness, and depression.  As a result of his condition he has limited ability to communicate, and is totally reliant on caregivers to assist him with all activities of daily living. He can stand and walk for very short distances with significant direct support and physical assistance. Neal uses a wheelchair which allows him to slowly get around his home, but he requires the assistance of two people to transfer.

187.    After the injury, Neal lived in a brain injury rehabilitation center and then a Residential Care Facility (RCF).

188.    Neal was the victim of abuse and neglect while he was residing at the RCF and was totally dependent on facility staff for his care. While Neal lived at the RCF, he repeatedly fell, and his incidents and behaviors of frustration increased dramatically. During one incident incoming shift staff found that Neal had been locked in his room, screaming, covered in his own waste. Staff couldn't find the key to his room and had to cut a window screen out to get to Neal. Within a short time after this incident Neal's family and case manager arrived to visit Neal and found that he had a black eye, bruising on his arm, and a broken finger. Once staff forgot to put up his bed rails and he fell out of bed and injured himself. Another injury was caused when a staff person who had no training in transfers attempted to move Neal, but dropped him.

189.   The RCF communicated to Neal's case manager that they were unable meet Neal's needs and stated that he needed a higher level of care,

190.   As a result of the abuse and Neal's increasing frustration and negative behaviors, Neal's family wanted him to return home with adequate supports to get him out of that situation. Neal's partner worked to modify their home to be accessible to Neal, and worked to arrange for HCBS services to be ready when Neal could leave the RCF.

191.   When attempting to arrange for Neal to receive care when he left the RCF, his case manager noted that other providers were not available to provide levels of support needed, and noted in Neal's case plan that "If current plan doesn't work, options with Carbondale, Brookhaven, or similar care environments will need to be reviewed." These residential rehabilitation facilities are located in Illinois, Oklahoma, and Wisconsin—far from Neal's home in West Des Moines.

192.   Neal has been receiving services under the Brain Injury Waiver since August of 2015.

193.   When Neal returned home in January of 2016, he received home care services, PT, OT, and speech therapy from an agency.

194.   In April of 2016 the Department of Human Services granted Neal an exception to policy allowing him to exceed the monthly cap of $2,954 allowed under the BI Waiver as a result of his request to increase his SCL units for a total monthly budget of $7,683.76. In granting this request, DHS acknowledged Neal's significant needs, and stated only that, as a condition of the approval Neal's need for the "intensive services must be supported by clear documentation justifying the need for intensive supports and supervision." Under this exception to policy, Neal

was able to receive 217 hours of SCL per month, and the state paid the agency $34 per hour for those services.

195.    Continued services through the agency were unsuccessful because they routinely failed to send staff for shifts, or sent staff without any brain injury, transfer, or medication dispersal training. As a result, Neal chose to change his services from being provided by the agency, to his own choice of staff by utilizing the Consumer Choice Option program. In doing so, Neal was able to increase his hours of service, while decreasing the amount paid by the state per hour for these services. This resulted in Neal requesting less than the original amount requested under the April 2016 Exception to Policy.

196.    All of Neal's selected staff are either registered nurses, licensed practical nurses, or certified nurse assistants. These employees all had employment backgrounds in brain injury services and several had previously served Neal when he was a patient at the brain injury rehabilitation center.

197.    On December 1, 2016 an InterRAI Home Care assessment was completed by an MCO contractor. This document indicated that Neal remains "severely impaired" and totally dependent on care for his Instrumental Activities of Daily Living (IADLs). It confirmed there was no change in Neal's overall self-sufficiency since the last assessment.

198.    A case plan dated 1/31/17 indicates that if Neal was "unable to receive appropriate supports within the home, he would need to be referred to a higher level of placement setting." And also indicated that his home is "clearly the least restrictive living arrangement for Neal." The assessment indicated that Neal's fee for service rate was $7201.04 for his home based SCL service, of 1336 units.

199.    On March 10th, Neal's MCO drafted a letter indicating Neal's CCO budget for March was not approved, as effective on that same day, March 10th.  The MCO later admitted that the letter was not issued until March 17th.  The reasoning provided was that the budget submitted exceeded the capped amount, and because the requested number of SCL units exceeded the cap of 961 units. Neal's budget was reduced to be below the BI Waiver capped amount of $3,013.08. As a result, SCL units were cut from 1336 to 558. 200.     After     this notice, two of Neal's CCO staff have resigned due to the uncertainty of Neal's service hours.

201.    The reduction of Neal's CCO budget by 58% or  over $4100 results in a decrease of 778 units of SCL. The reduction effectively cuts Neal's service hours from approximately 10 hours per day on  average, to four hours per day.

202.    Neal is unable to be by himself. His partner works and cannot be at home to supervise him 20 hours a day. Because Neal's dignity, health and safety require one on one supervision, if he were to be potentially alone for many hours during the day he could no longer safely stay at home and would have to move into a brain injury facility or nursing facility.

203.    Neal timely appealed the MCO's decision and requested continuation of his benefits allowing him to maintain his level of services while the reductions are challenged. If he is unsuccessful at state fair hearing, the reductions will take effect and he and his family are afraid of him having to return a facility like the RCF where he was abused.

E. Defendants' Responsibility for the Crisis.

204.    Upon information and belief, the actions of the Defendants and the managed care agents, including the AmeriHealth Directive, resulted or will result in an across-the-board cut to the budgets of the Plaintiffs and others similarly situated.

205.    Upon information and belief, neither the Defendants nor their managed care agents provided advance written notice of the budget cuts to the some Plaintiffs and others similarly situated, which explained the factual and legal reasons for the cuts, a description of their appeal rights including the right to keep services in place pending an appeal and fair hearing as required by law.

206.    Defendants have failed to provide Plaintiffs with due process and have allowed their agents' failure to do so.   For example, the Defendants allowed AmeriHealth to inform some Plaintiffs who are receiving HCBS Waiver Services through a provider agency that they have no appeal rights.

207.    Plaintiffs have been or will be irreparably harmed by the Defendants because they may lose community integration, be forced to move out of the least restrictive settings appropriate to their needs, or be institutionalized or re-institutionalized as a result of their HCBS services not being based on their individualized needs and preferences; their services and supports have been or will be reduced, their physical and mental health has or will deteriorate as a result of the cuts and they or their family have or will have to try to pay out-of-pocket for the services they need.

208.    Upon information and belief, the Defendants and their agents have engaged in other patterns and practices which have resulted in actual service cuts for Plaintiffs and others similarly situated in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Medicaid Act, and their respective regulations, and the United States and Iowa Constitutions.

## VII.    CLAIMS FOR RELIEF

### First Claim for Relief: Procedural Due Process

209.    Plaintiffs restate and incorporate by reference paragraphs 1 through 208 above.

210.    The Due Process Clause of the Fourteenth Amendment prohibits states from denying, reducing, or terminating Medicaid services without due process of law. The Constitutional right to due process of law includes the right to meaningful notice, including the reason for the denial and the specific laws or regulations that support the decision, prior to the termination or reduction of Medicaid benefits; continued benefits pending a pre-termination hearing; and a fair and impartial pre-termination hearing.

211.    The Iowa Constitution provides that "no person shall be deprived of life, liberty, or property, without due process of law."  Iowa Constitution, Art. 1, § 9.

212.    Defendants' agents have failed to issue any notice to many Plaintiffs when terminating, reducing, or denying their HCBS, and have issued inadequate notice to many other Plaintiffs in violation of their due process rights under the Federal Medicaid Act pursuant to 42 U.S.C. § 1396a(a)(3) and under the Due Process Clause of the U.S. and the Iowa Constitution.

213.  These violations, which have been repeated and knowing, entitle plaintiffs to relief under 42 U.S.C. § 1983 and 42 U.S.C. § 1396a(a)(3) and under the Due Process Clause the U.S. Constitution .

### Second Claim for Relief: Due Process: Lack of Ascertainable, Non-Arbitrary Standards

214.    Plaintiffs restate and incorporate by reference paragraphs 1 through 208 above.

215.    In order to comply with due process, a State Medicaid program must use reasonable, ascertainable, non-arbitrary standards and procedures for determining eligibility for and the extent of medical assistance provided.

216.    Defendants' agents are using vague, subjective, arbitrary and secret criteria and procedures for determining the amount, duration, and scope of Plaintiffs' HCBS. Defendants' authorization criteria for services, including exceptions, are therefore inconsistent with the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

217.    These violations, which have been repeated and knowing, entitle plaintiffs to relief under 42 U.S.C. § 1983 and the Due Process Clause.

**Third Claim for Relief: Violations of Reasonable Promptness**

218.    Plaintiffs restate and incorporate by reference paragraphs 1 through 208 above.

219.    Plaintiffs are entitled to declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202 because Defendants are violating the "reasonable promptness" requirement of Title XIX of the Social Security Act, 42 U.S.C. § 1396a(a)(8), by implementing a policy that *de facto* rations coverage for Medicaid enrollees who need HCBS, thereby requiring Plaintiffs and those like them to delay care unless or until providers willing to provide the services can be located.

220.    These violations, which have been repeated and knowing, entitle plaintiffs to relief under 42 U.S.C. § 1983 and 42 U.S.C. § 1396a(a)(8).

**Fourth Claim for Relief: Americans with Disabilities Act**

221.    Plaintiffs restate and incorporate by reference paragraphs 1 through 208 above.

222.    Each of the Plaintiffs and Plaintiff Class Members are  "qualified individuals with a disability" within the meaning of 42 U.S.C. § 12131(2). Each of the Plaintiffs has a disability that significantly limits his or her life major life activities.

223.    Defendant has violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act and their implementing regulations, 28 C.F.R. §§ 35.130(b)(3) and

41.51(b)(3)(i) and 45 C.F.R. § 84.4(b)(4) by utilizing methods of administration that subject Plaintiffs and Class Members to discrimination on the basis of disability, including unnecessary segregation from the community, and by failing to account for individual medical necessity in the denial of HCBS that would enable Plaintiffs and Class Members to maintain integration in the community.

224.    Defendants' policy of denying, terminating, and reducing HCBS to Plaintiffs threatens Plaintiffs' full integration into the community and their ability to remain in their homes. It therefore violates the Americans with Disabilities Act, 42 U.S.C. § 12131-12134, and its implementing regulations, which prohibit discrimination on the basis of disability and require that services be made available in the most integrated setting appropriate to the needs of the individual, where to do so meets the needs of qualified individuals with disabilities, and require that reasonable modifications be made to state programs to avoid discrimination on the basis of disability.

### Fifth Claim for Relief: Rehabilitation Act

225.    Plaintiffs restate and incorporate by reference paragraphs 1 through 208 above.

226.    Each of the Plaintiffs is a qualified individual with a disability within the meaning of 29 U.S.C. § 794(a).

227.    The Iowa Department of Human Services received Federal financial assistance for its Medicaid program.

228.    Defendants' policy of denying, terminating, and reducing HCBS to Plaintiffs without a reasonable modification to account for their needs puts them at risk of increased segregation from the community, having to move to a less integrated setting, or institutionalization. It therefore violates Section 504 of the Rehabilitation Act, 29 U.S.C. §

794(a), and its implementing regulations, which prohibit discrimination on the basis of disability, require services be made available in the most integrated setting appropriate to the individual's needs, where to do so meets the needs of qualified individuals with disabilities, and require that reasonable modifications be made to state programs to avoid discrimination on the basis of disability.

## VIII.  REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.     Certify this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2).

B.     Issue a declaratory judgement pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that Defendants' actions, policies, procedures and practices as alleged herein are in violation of the Medicaid Act, the Due Process clauses of the U.S. and Iowa Constitutions, and the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and their respective regulations.

C.     Grant preliminary and permanent injunctions enjoining Defendants and their offices, agents, employees, contractors and all persons who are in active concert or participation with them from arbitrarily denying, reducing or terminating Medicaid services to Plaintiffs and class members until after complying with the Medicaid Act and Due Process, and requiring Defendants to prospectively reinstate services that have been denied, reduced or terminated to Plaintiffs and class members by reason of the cost containment measures until the violation of law alleged herein are corrected.

D.     Maintain jurisdiction over this action to determine that Defendants complies with the declaratory judgements granted and the injunctive relief ordered.

E.     Require Defendants to provide corrective notice to all Medicaid beneficiaries including Plaintiffs, where their HCBS has been denied, terminated, or reduced, informing them of a state-

based procedure that will be developed, implemented, and available to them for determining the amount of HCBS to which they are entitled pursuant to revised criteria that are consistent with their medical needs;

F.      Award the Plaintiffs the costs of this action and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

G.      Grant such other relief which the Court deems just and equitable.

Dated:   June 13, 2017


Respectfully submitted,

ROXANNE B. CONLIN & ASSOCIATES, P.C.

/s/ Roxanne Conlin
Roxanne B. Conlin, AT0001642
roxlaw@aol.com
319 Seventh Street, Suite 600
Des Moines, Iowa 50309
Telephone: (515)283-1111

DISABILITY RIGHTS IOWA

/s/ Jane Hudson
Jane Hudson, AT0011646
jhudson@driowa.org
Cynthia A. Miller, AT0005382
cmiller@driowa.org
400 East Court Avenue, Suite 300
Des Moines, Iowa 50312
Telephone: (515)278-2502

NATIONAL HEALTH LAW PROGRAM, INC.

/s/ Elizabeth Edwards
Elizabeth Edwards
edwards@healthlaw.org
Abigail Coursolle
coursolle@healthlaw.org
200 N. Greensboro St. Suite D-13

Carrboro, North Carolina 27510
Telephone: (919)968-6308
*Pro hac vice applications forthcoming*

ATTORNEYS FOR PLAINTIFFS